606 F.2d 437
 BLUE AND GREY TRANSIT, INC., et al., Petitioners,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
Boise-Winnemucca Stages, Inc., et al., intervenor-petitioner
Intervenors,
Southeastern Stages, Inc., intervenor-petitioner Intervenors,
Trailways, Inc., intervenor-respondent Intervenor,
American Bus Association, intervenor-petitioner Intervenor,
Las Vegas-Tonapah-Reno Stage Lines, Inc.,
intervenor-petitioner Intervenor.
 No. 79-1414.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 13, 1979.
Decided Sept. 19, 1979.
 
 John M. Ballenger, Washington, D. C., Samuel Zinder, Great Neck, N. Y. (Lawrence E. Lindeman, John R. Sims, Jr., Washington, D. C., Bates Block, Atlanta, Ga., Charles A. Webb, Washington, D. C., on brief), for petitioners and intervenor-petitioners.
 James P. Tuite, Deputy Associate Gen. Counsel, Interstate Commerce Commission, Robert Lewis Thompson, Dept. of Justice, Washington, D. C. (John H. Shenefield, Asst. Atty. Gen., Robert B. Nicholson, Asst. Chief, App. Section, Antitrust Div., Mark L. Evans, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., on brief), for respondent USA and Interstate Commerce Commission.
 Before HAYNSWORTH, Chief Judge, and WINTER and MURNAGHAN, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Acting on a request from Trailways, Inc. made on April 30, 1979, the Interstate Commerce Commission on July 12, 1979,[1] announced that temporary authority to operate interstate bus service would be granted to any person who applied for it and who met certain criteria relating to the proposed new service. Ex parte No. MC-126, General Temporary Order No. 18, 44 Fed.Reg. 41,999 (1979).[2] Such temporary authority was in every case to expire on September 25, 1979.
 
 
 2
 The request of Trailways and the action of the Commission stemmed from a perceived substantial gasoline shortage during the spring and summer of 1979 and from the anticipated resulting large increase in the public's need for interstate bus service. Numerous holders of operating authority from the Commission appeal the July 12 decision, and they raise essentially three categories of objections.
 
 
 3
 1. Petitioners assert that the grants contemplated by Ex parte No. MC-126 exceeded the Commission's authority under 49 U.S.C. § 10928[3] because (a) the needs to be met by the temporary grants were anticipated future needs rather than the "immediate" needs referred to in the statute, because (b) existing carriers had excess capacity whereas the statute requires, as a prerequisite to action by the Interstate Commerce Commission, that "no motor . . . carrier be capable of meeting" those immediate needs, and because (c) the act of issuing Ex parte No. MC-126 was an example of rulemaking whereas § 10928 authorized only licensing, a form of adjudication.
 
 
 4
 (a) The need for bus service and its immediacy are measured not merely by actual customers filling bus seats or lined up at ticket windows or waiting on benches in the terminals. Because gasoline-starved vacation travelers who might wish to reserve rooms or to forego train or plane reservations had to know well in advance whether or not bus service would be available for them, the need was immediate and was properly considered by the Commission.
 
 
 5
 (b) Petitioners urge that the presence of excess capacity on existing carriers negatives authority to act under § 10928. Their contention misses the point that the immediate need was in part a need for present assurance that the interstate system would not break down under an unprecedented surge of passengers.
 
 
 6
 (c) No grant of an individual temporary authority pursuant to Ex parte No. MC-126 would be valid if an identical grant would not also be valid in its absence. In each and every consideration of single applications premised on the perceived need for additional service due to anticipated fuel shortages, one matter to be addressed would be that dealt with in Ex parte No. MC-126. The Commission's decision, therefore, merely addresses an issue common to every individual grant for a temporary operating license in the general category with which we are here concerned. We expect that any agency in the position of the Commission would make such individual temporary grants with close attention to the statutory authorization for them. To the extent that Ex parte No. MC-126 is more than a press release announcing how the Commission intends to exercise its discretion under § 10928, it limits and makes more predictable the exercise of that discretion. Such rationalizing of even emergency discretion amounts to a preliminary step in the temporary licensing process and falls within the power granted by § 10928.
 
 
 7
 2. Petitioners also complain that the Commission did not comply with the procedural requirements of the Interstate Commerce Act[4] or of the Administrative Procedure Act.[5] 49 U.S.C. § 10928, however, contains a clear exemption from those requirements. Since Congress exempted the actual emergency granting of temporary authority from those provisions, we conclude that the exemption extends also to actions such as this, channeling for a limited period of time the discretion with which such grants will be made.
 
 
 8
 The subsequent easing of the gasoline crisis and the absence of a deluge of bus passengers have been pressed on us as showing insufficient evidence for, and a lack of rationality in, the Commission's action. It is true that utilization of service for substantial periods up to July 12, 1979, left some excess capacity. But the Commission's decision need not have been rigidly bound by patterns of utilization in times when there was no fuel shortage or when the shortage was qualitatively different from that reasonably apprehended at the time the Commission acted. The fuel shortage in fact did not prove as severe or as protracted as was feared. We require, however, not that the Commission possess a crystal ball but only that its action in temporary authority cases be rationally based on some evidence at the time the action was taken and that the action not be arbitrary or capricious.[6] Ex parte No. MC-126 meets those tests.
 
 
 9
 3. Finally, Petitioners contend that many of the temporary authorizations which might be, or which have been, granted by the Commission, exceed in specific respects the authority conferred by § 10928. In this regard, they speculate as to possible grants which might be made which would literally fit the various criteria spelled out in Ex parte No. MC-126 but which would seem outrageous. First, as we have already pointed out, we assume that the policy announced by the Commission in their July 12 action will be administered in a manner governed by the limitations in § 10928. Second, objections to hypothetical grants which might be made are unripe, and we will not consider them. As for some specific grants which have been made and of which Petitioners complain, the actual facts surrounding them would have to be before us to permit informed decision. The instant case properly concerns only the July 12 action by the Commission, and on the present record we will not consider the actual temporary authorizations later granted.
 
 
 10
 Implicit in all of Petitioners' arguments is the allegation that statutory authority to meet short-term emergencies with short-term grants of authority is being used by the Commission to effect long-term policy changes, that the reduced procedural requirements provided by § 10928 are being abused because the Commission is using its increased emergency discretion to run an experiment in deregulation or even to effect a partially deregulated fait accompli from which return to the regulated status quo ante will be impractical. We do not suggest that agencies in exigent circumstances should exercise their discretion without sensitivity to likely post-emergency policies. Nor do we condemn the gathering of information during emergencies for use in the formulation of those later policies. But we note that counsel both for the Commission and for Petitioners have told us that they know of no plans to renew or extend Ex parte No. MC-126. Our response in this case might be different if we believed that the Commission were attempting to effect a fait accompli.
 
 
 11
 The petition challenging the action of the Interstate Commerce Commission is, for the reasons stated, denied.
 
 
 12
 PETITION DENIED.
 
 
 
 [1]
 In the interim between the request and the Commission's action, the Commission had given notice of the Trailways proposal and had sought comments on it. See 44 Fed.Reg. 30,810 (1979)
 
 
 [2]
 To be successful, an application was required to propose one of the following:
 (a) To provide service to points having no present interstate motorbus service;
 (b) To provide service over routes between points having no present direct interstate motorbus service;
 (c) To provide service at intermediate points on regular routes (including alternate routes, for operating convenience only) authorized in certificates of public convenience and necessity;
 (d) To remove restrictions on service at points the applicant is already authorized to serve on some traffic;
 (e) To provide direct service over alternate routes between existing service points for advance or extra sections of presently scheduled services, without regard to the degree of circuity eliminated, provided that the scheduled service is maintained for all passengers presenting themselves for transportation at the scheduled time;
 (f) To provide direct joint-line service over alternate routes between existing service points for advance or extra sections of presently scheduled through-bus interline services, without regard to the degree of circuity eliminated, provided that the scheduled service is maintained for all passengers presenting themselves for transportation at the scheduled time, and provided that the application is submitted jointly by all the carriers participating in the underlying scheduled through-bus service between the points involved;
 (g) To provide interstate service over routes currently operated in intrastate commerce only; or
 (h) To provide services over a route where an existing carrier is unwilling or unable to provide, through its own or leased equipment, service which conforms to the Commission's Regulations Governing the Adequacy of Intercity Motor Common Carrier Passenger Service (49 CFR 1063).
 
 
 [44]
 Fed.Reg. at 42,001-02
 
 
 [3]
 49 U.S.C.A. § 10928 (West Supp. 1979) reads in full:
 § 10928. Temporary authority for motor and water carriers
 Without regard to subchapter II of chapter 103 of this title and subchapter II of chapter 5 of title 5, the Interstate Commerce Commission may grant a motor carrier or water carrier temporary authority to provide transportation to a place or in an area having, respectively, no motor carrier or water carrier capable of meeting the immediate needs of the place or area. Unless suspended or revoked, the Commission may grant the temporary authority for not more than 180 days. A grant of temporary authority does not establish a presumption that permanent authority to provide transportation will be granted under this subchapter.
 
 
 [4]
 See 49 U.S.C.A. §§ 10321-10330 (West Supp.1979)
 
 
 [5]
 See 5 U.S.C.A. §§ 551-559 (West 1977 & Supp. 1979)
 
 
 [6]
 See East Tex. Motor Freight Lines, Inc. v. United States, 593 F.2d 691 (5th Cir. 1979); East Coast Transp. Co., Inc. v. United States, 556 F.2d 741 (5th Cir. 1977) (per curiam); Garrett Freightlines, Inc. v. United States, 540 F.2d 450 (9th Cir. 1976) (per curiam)